IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF GEORGIA

ATLANTA DIVISION

UNITED STATES OF AMERICA,      :

v.                             :      CRIMINAL CASE NUMBER:

ELIZABETH MEJIA-VELAZQUEZ   :      1:21-CR-137-SDG-JSA

## REPORT AND RECOMMENDATION

Defendant in this narcotics trafficking and firearms case moves to suppress the proceeds of a warrantless search of her home, including incriminating statements she made to law enforcement. *See* Motions To Suppress [21][22][26][27]. For the reasons explained below, on the basis of evidence obtained in a hearing on November 17, 2021, *see* Transcript [39] ("Tr.") the Court **RECOMMENDS** that the Motions To Suppress be **DENIED**. The Court also **RECOMMENDS** that Defendant's Motion to Dismiss Counts [23] be **DENIED**.

## I.    FACTS

On February 23, 2021, law enforcement officers with the Atlanta High Intensity Drug Trafficking Area ("HIDTA") initiated a so-called "knock and talk" investigatory visit to a residence at Ivy Stone Trail in Buford, Georgia. Tr. at 9. The officers had received a tip from U.S. Drug Enforcement Administration agents that a suspected Georgia-based drug dealer known as "Liz" had been tracked to

this location via her cellphone's geolocational data, which DEA agents in Charlotte were receiving via a search warrant. *Id*. at 8-10.

Task Force Officer Howard Spitzer, DEA Special Agent Justin Clutter, and a third Spanish-speaking officer (Juan Lopez Martinez) present for possible interpretation purposes, came to the front door of the residence and knocked. *Id*. at 8-10. Seven other officers, including uniformed and openly armed officers, remained in the front yard/driveway area, by the road. *Id*. at 8-10, 80. The other officers remained away from the front door of the house because, as Clutter explained, "we do that typically when we are trying to just talk to somebody in environments, so they don't feel like they are overwhelmed with a bunch of officers." *Id*. at 80.

The Defendant answered the door. *Id*. at 11. Spitzer identified himself and asked if they could come inside and talk with Defendant about an "important matter." *Id*. at 10-11. Defendant responded, "absolutely," and brought Spitzer, Clutter and Martinez to a kitchen area inside the apartment. *Id*. at 11-12. The other officers remained outside around the driveway area. *Id.* at 80. Defendant introduced herself as "Elizabeth," which was consistent with the tip received from DEA that suggested a suspect drug dealer named "Liz" had been tracked to the residence. *Id.* at 13.

Spitzer explained that the officers were there to investigate possible drug trafficking, and he asked Defendant whether others were present in the residence. *Id.* at 13-14. After Defendant responded in the affirmative, the officers asked if they could make a safety sweep to locate the other individuals who were present. *Id*. Defendant replied, "absolutely." *Id*.

Spitzer, Clutter and Martinez went upstairs to sweep that area and invited Defendant to come with them. *Id*. at 16. After the group left the kitchen area and went upstairs, other officers entered to help conduct the safety sweep throughout other areas of the house. *Id*. at 37-38. While in an upstairs bedroom, Spitzer and Clutter observed and took temporary custody of a gun. *Id*. Clutter also observed two cellular phones lying on what he understood to be the Defendant's bed. *Id*. at 62-63. As the others were going back downstairs, Clutter briefly called the telephone number of the phone that the investigators had previously associated with the suspected drug dealer "Liz." *Id.* At that point, as Clutter explained, "one of the phones started ringing. I can't remember whether it was vibrating or ringing out loud. I just noticed that the phone was receiving a call." *Id.*[1] Clutter took the

---

[1] Confusingly, the Government's brief slightly misstates this testimony by stating, "SA Clutter could not remember whether the phone rang out loud, vibrated, *or simply illuminated.*" Gov't Br. [46] at 4 n. 3 (emphasis added). As noted above, Clutter did not reference the possibility of the phone merely illuminating, but rather said, "one of the phones started ringing. I can't remember whether it was vibrating or ringing out loud."

phone that received the call and brought it downstairs to where Defendant and Spitzer were seated. *Id.* at 19, 63.

Meanwhile, Defendant had asked Spitzer if she could use a phone to call her wife or her attorney. *Id*. at 16. Spitzer responded, "why would you need to call your attorney if you haven't done anything wrong?" *Id*. Spitzer had asked Defendant, is there anything "illegal in the house," and she said, "not that I know of." *Id*. Defendant added that she and her wife used marijuana, but she did not believe there was any marijuana in the house, and that her wife also used cocaine although Defendant did not know whether there was cocaine in the house. *Id*.

When Clutter returned with the phone that had been on Defendant's bed, he asked Defendant whose phone it was. *Id*. at 19, 63. He also informed Defendant that he believed she "knew a lot" about the suspected illegal drug activity in the house. *Id*. at 20. Defendant at that point asked to speak to the agents in a more private location within the house away from family members. *Id*. at 20-21. She proceeded to answer questions and provide information about drug trafficking activity for 15-20 minutes and she also stated that she wished to work as a "source." *Id*.  at 22.

Defendant was not restrained and did not terminate the conversation. *Id*. at 17-18. When Spitzer asked whether she would consent to a search of the house, Defendant asked if they had a warrant, and when Spitzer told her they did not have

a warrant, Defendant informed him that she would "prefer" that they do any search pursuant to a warrant. *Id.* 18.

At Clutter's request, Defendant took the officers back up to the bedroom to retrieve her identification. *Id.* at 22. When Clutter asked her whether there was anything "illegal" in the room including cash, Defendant retrieved a black duffel bag near the closet and pulled out bundles of U.S. currency. *Id.* at 23. Clutter asked Defendant about drugs, and Defendant retrieved bags containing methamphetamine in both the dresser drawer and closet. *Id.* at 23.

At some point during this discussion other agents arrived and began discussing whether Defendant should be arrested. *Id.* at 24. Clutter expressed the view that she should not be arrested and rather used as a source. Id. at 24-26. Clutter asked whether there were any additional drugs and Defendant responded, "not in here." *Id.* When asked to clarify, Defendant explained that there was a "bag of drugs in the trunk" of a car. *Id.* at 26-27. She took the agents to the car and retrieved the bag that contained heroin, methamphetamine and cocaine. Around this time Defendant agreed to consent to search and executed the DEA form, which included the statement, "I have not been threatened or forced in any way. I consent to this search." *Id.* at 29, Gov't Ex. 1. Agents subsequently found what they believed to be a drug ledger. *Id.* at 31.

Defendant was apparently not used as a source, and she was subsequently arrested and read *Miranda* rights. Tr. at 66-68.  She indicated she would waive those rights and she signed the appropriate DEA waiver form. *Id*., Gov't Exs. 2-3. Defendant then made further incriminating statements. *Id*.

## II.    DISCUSSION

### A. *The "Knock and Talk" and The Agents' Initial Entry*

A warrantless entry of an individual's home is presumptively unreasonable. *See United States v. Tovar-Rico*, 61 F.3d 1529, 1534 (1995). Warrantless entries into and searches of such premises are permitted, however, where the prosecution proves that the police acted upon the voluntary and freely-given consent of a resident.  *See, e.g., United States v. Garcia*, 890 F.2d 355 (11th Cir. 1989).

In this case, Defendant did not initially consent to any search of her residence, and in fact declined to give such consent. But she did allow the officers entry into the residence when they requested permission to talk to her about an "important matter."

Under the so-called "knock and talk" exception to the search warrant requirement, a "police officer not armed with a warrant may approach a home and knock, precisely because that is no more than any private citizen may do." *Florida v. Jardines*, 569 U.S. 1, 8 (2013). In doing so, the police cannot engage in a ruse for the sole purpose of conducting some other search, *see Jardines*, 569 U.S. at 9,

and a "knock and talk" is not valid if the officers engage in conduct that "objectively" reveals a purpose to conduct a search, *see United States v. Walker*, 799 F.3d 1361, 1363 (11th Cir. 2015).

However, "[a] knock and talk is not invalid simply because, in the course of seeking to speak to the occupants of a residence in furtherance of an investigation, officers ask for and obtain consent to enter the residence and ask and gain consent to search the premises." *United States v. Washington*, 1:19-CR-145, 2020 WL 3885752 (N.D. Ga. Jan. 27, 2020) (King, M.J.), *report and recommendation adopted by United States v. Washington*, 1:19-CR-145, 2020 WL 1887903 (N.D. Ga. Apr. 15, 2020). Indeed, "officers may seek consent-based encounters if they are lawfully present in the place where the consensual encounter occurs" and, "[i]f consent is freely given, it makes no difference that an officer may have approached the person with the hope or expectation of obtaining consent." *Kentucky v. King*, 563 U.S. 452, 463 (2011).

In this case, Spitzer, Clutter, and Martinez came to the door and asked Defendant if they could enter and talk to her about an "important matter." The Court easily finds that the officers in doing so engaged in a permissible "knock and talk." All the officers did at this juncture was literally knock on the door and talk to Defendant, which was well within the implied license. There is no evidence that the officers engaged in any ruse to justify any more intrusive activities or engaged

in any searches such as with a drug-sniffing dog, or heat sensing device, or the like.

Defendant complains that the numerous other additional officers on the outskirts of the curtilage of the house objectively exceeded the bounds of the implied license generally allowing a knock-and-talk. The evidence shows that these officers were waiting in the driveway/front yard area, by the street, purposefully distanced from the front door to avoid "overwhelm[ing]" Defendant. *See* Tr. at 8, 80. There is no evidence that these additional officers were actively doing anything or engaging in anything suggestive of a search at the time Clutter and Spitzer asked Defendant for permission to enter.

The Court cannot find that the mere presence of these agents invalidates the knock-and-talk. Merely having additional agents generally on the scene for apparent support or backup purposes, including the "standard practice" of having a uniformed local law enforcement representative present, Tr. at 9, does not itself objectively show that the officers were engaged in a search as opposed to a knock-and-talk. Nor does the fact that some of these agents later entered the house for purposes of assisting with the protective security sweep, and then exited once the

sweep was finished, *Id.* at 38, objectively suggest that they were present from the outset for the sole purpose of conducting a search.[2]

The question then becomes whether the Defendant consensually allowed Clutter, Spitzer and Martinez inside the residence at least for the purpose of answering their questions. The Court finds the answer to be yes.

Among the relevant facts considered when a court assesses whether consent was freely and voluntarily given, are the custodial status of the person giving consent, the presence of coercive police procedure, the extent and level of cooperation with the police, the person's awareness of her right to refuse to consent to entry or search of the premises, and the education, intelligence and the subjective state of the person who consents. *See Tukes v. Dugger*, 911 F.2d 508, 517 (11th Cir. 1990) (internal citations omitted). While a person need not necessarily be told of her right to refuse to consent, the lack of advice of the right to refuse consent is a factor to be considered by the Court. *Schneckloth v. Bustamonte*, 412 U.S. 218, 227–234 (1973).

---

[2] That the support officers in this case remained towards the street distinguishes this case from *United States v. Maxi*, 886 F.3d 1318, 1327 (11th Cir. 2018). In that case, the Eleventh Circuit found a team of officers to have exceeded the bounds of a "knock and talk," where four or five officers approached the front door, and several others took "tactical positions" surrounding the residence including with drawn weapons, and in doing so actually entered through a gate in a fence. The record does not remotely suggest such an intrusion here, where three officers came to the door, and the others remained back at the edge of the curtilage by the street.

There is no evidence that the officers affirmatively advised Defendant of her right to refuse entry. However, there is no evidence of any coercive tactics or statements either. To the contrary, the unrefuted evidence is that the officers merely stated that they wanted to talk to Defendant about an "important matter" and that they requested (not demanded) to enter. In response, she invited them in by saying "absolutely." While there were numerous officers present, the team purposefully kept the majority of the group at a distance so as to avoid "overwhelm[ing]" Defendant. Tr. at 80.

The evidence also shows that Defendant was aware of her rights. When the officers later requested consent to search, Defendant asked them if they had a warrant, and then declined to give consent when they answered in the negative. These circumstances strongly suggest that the Defendant knew her rights, knew she was entitled to decline entry into her home, and that her will in that regard was not overborne. This discussion also strongly suggests that Defendant is intelligent and was of clear mind. In sum, these circumstances show that Defendant willingly and voluntarily allowed the officers inside the house at least to talk to them.

## B. *The Security Sweep*

The officers then requested permission to conduct a security sweep, having been advised that other individuals were present in the residence. Again, the unrefuted testimony of the officers was that Defendant readily agreed to permit this

security sweep (by again saying "absolutely"), and the Court again finds that she did so voluntarily. There also remains no evidence of any coercive behavior or statements by the officers, and the evidence instead shows that they worded their request as just that, i.e., a request, not a demand. All of the other factors discussed above, including the Defendant's demonstrated knowledge of her legal rights and willingness to say no to the officers in response to their requests for consent to search, combine to support a finding that her consent for the security sweep was voluntary.

Defendant suggests that the officers in conducting a security sweep possessed an ulterior motive to visually inspect the residence. But the Supreme Court has "'repeatedly rejected' a subjective approach, asking only whether 'the circumstances, viewed objectively, justify the action.' ... Indeed, [the Supreme Court has] never held, outside the limited contexts such as an 'inventory search or administrative inspection ..., that an officer's motive invalidates objectively justifiable behavior under the Fourth Amendment.'" *King*, 563 U.S. at 464 (internal citations omitted); *United States v. Hromada*, 49 F.3d 685, 690-91 (11th Cir.1995) (stating that an arresting officer's desire to search for evidence of illegal activity in executing objectively-justified and valid protective sweep of defendant's residence pursuant to in-home arrest was irrelevant to the legality of the search as protective sweep).

Thus, the agents may have indeed harbored additional motives, but it remains that they were objectively permitted to undertake a security sweep. The officers had secured Defendant's voluntary consent for them to engage in this procedure, the need for which was inherently reasonable when in an unsecured house associated with a suspected drug trafficker with unknown individuals present. The officers also did not exceed the bounds of security sweep. There is no evidence that the officers entered any locked or closed premises, opened any drawers, or rifled through any papers.

Having been engaged in a security sweep, the officers were entitled to seize evidence they saw in plain view. "The plain view doctrine permits a warrantless seizure where (1) an officer is lawfully located in the place from which the seized object can be plainly viewed and [has] a lawful right of access to the object itself; and (2) the incriminating character of the item is immediately apparent." *United States v. Smith*, 459 F.3d 1276, 1290 (11th Cir.2006) (internal quotation marks omitted).

Here, the two cellphones that Agent Clutter observed were openly laying on top of the bed. The incriminating nature of these phones was not necessarily immediately apparent. But it became apparent quickly, as to one of the phones, after Agent Clutter took the minimal additional step of calling the cellphone number associated with the drug dealer "Liz," and then observed that one of the

phones on the bed was ringing. At that point, Agent Clutter had probable cause to believe that this phone was evidence of drug trafficking activity and he was entitled to seize it pursuant to the plain view doctrine.

That the applicability of the plain view doctrine in this case involved the minimal additional step of calling the phone does not invalidate the seizure. The courts have made clear that merely calling a phone number suspected to belong to a target, and using one's ordinary sense of hearing or sight to observe that a particular phone was simultaneously receiving a call, does not itself constitute a search implicating the Fourth Amendment. *See United States v. Brixen*, 908 F.3d 276, 281-282 (7th Cir. 2018); *United States v. Lawing*, 703 F.3d 229, 238 (4th Cir. 2012) (seizing a motorist's phone, and then calling the phone number of a suspect to see if the phone rang, was not a Fourth Amendment violation); *United States v. Conley*, 342 F.Supp.2d 247, 264-265 (D. Conn. Sept. 20, 2018) ("[T]he court holds that Special Agent Mofenson did not conduct a 'search' within the meaning of the Fourth Amendment when he called the Targeted Phone and heard the phone ringing inside the car. Because the call was not a search, the Fourth Amendment's protections do not apply."); *United States v. Pineda-Areola*, No. 4:07-CR-0007-5-DFH-MGN, 2008 WL 126644, at *4 (S.D. Ind. Jan. 10, 2008) ("Dialing the telephone number was not a search within the meaning of the Fourth Amendment and did not invade any protected privacy interest.")

Defendant complains that Agent Clutter's actions exceeded the scope of her consent to allow him entry solely for purposes of answering questions and then to conduct a security sweep. But Agent Clutter did not require Defendant's consent to merely call a phone number that he already independently had. In other words, while he gained entry to the room pursuant to Defendant's consent for a security sweep, his minimal action in placing a phone call while in the room did not require additional consent.

Defendant cites *Arizona v. Hicks*, 480 U.S. 321 (1987), for the proposition that "[t]aking action, unrelated to the objectives of the authorized intrusion, which exposed to view concealed portions of the apartment or its contents, did produce a new invasion of respondent's privacy unjustified by the exigent circumstance that validated the entry." *Id.* at 323-325. In *Hicks*, however, an officer who had entered a residence on the basis of exigent circumstances, physically moved a piece of stereo equipment in a target's home, for the unrelated purpose of being able to see the otherwise-obscured serial number and determine that the equipment had been stolen. *Id.* As the Court explained, "Officer Nelson's moving of the equipment, however, did constitute a '*search*' separate and apart from the search for the shooter, victims, and weapons that was the lawful objective of his entry into the apartment." *Id.* at 324-325 (emphasis added). Thus, because the officer conducted a separate warrantless *search* while in Fourth Amendment-protected premises,

unjustified by any Fourth Amendment exception, in order to determine the incriminating nature of the object, the officer could not rely on the plain view doctrine to seize it.

*Hicks* is similar to *United States v. Lall*, 607 F.3d 1277, 1291-1292 (11th Cir. 2010), also cited by Defendant. In *Lall*, an officer investigating credit card fraud seized computer equipment from a suspect's residence supposedly based on plain view. The officer, however, admitted that he did not know from merely looking at the equipment that it was evidence or an instrumentality of the fraud. Rather, after seizing the equipment, he brought it to the defendant, who admitted in response to interrogation that the equipment was used to effectuate the fraud. The Court, which later found that the defendant's statements were obtained in violation of *Miranda*, likewise found that the equipment itself was not in "plain view" when seized, because its incriminating nature was not apparent at that moment. *Id*.

*Hicks* and *Lall* do not assist Defendant here, for the basic reason that Clutter did not conduct any search or seizure implicating the Fourth Amendment by simply calling "Liz's" phone. Merely dialing a phone number, in other words, is not akin to physically seizing and picking up an object for purposes of searching for and reading otherwise hidden markings (as in *Hicks*), or bringing it to a suspect for him to identify it and explain its significance (as in *Lall*). Defendant cites no case suggesting that dialing a phone number rises to the level of a Fourth

Amendment intrusion, and the cases set forth above state otherwise. Clearly, the police need no warrant to merely call a phone number, including the phone number of a suspect. It follows that Clutter was not prohibited from calling "Liz" while within Defendant's residence.[3]

Defendant articulates another theory to undermine the plain view doctrine for the first time in her reply brief. Defendant speculates that if the phone simply illuminated upon being called, as opposed to ringing or vibrating, and if it was lying face-down on the bed, then Clutter would not have known that it was receiving a call without first picking it up. Defendant does not offer evidence that the phone was lying face-down, or that it was in silent/non-vibrating mode such that it only would have registered an incoming call by illumination. Rather, Defendant argues that because the Government bears the burden of proof, and because Clutter did not affirmatively exclude these possibilities, the Court should disallow the Government's use of the plain view doctrine.

The Court finds that Clutter's testimony was adequate to show that he immediately perceived the phone to be receiving a call without first picking it up. First, while the Government's brief confusingly states that "SA Clutter could not

---

[3] Moreover, it is also notable that the officers actually did have a warrant allowing them to electronically reach out to and collect data from "Liz's" phone for purposes of identifying its location. It is illogical to think that the officers could lawfully "ping" the phone for geolocational data but could not place an ordinary phone call to it without getting a separate warrant.

remember whether the phone rang out loud, vibrated, or simply illuminated,"

Gov't Br. [46] at 4 n. 3, that is not in fact what Clutter said. The relevant testimony

was as follows:

> Q.     …. You dialed that number from your phone?
>
> A.     Yes.
>
> Q.     And what happened?
>
> A.     One of the phones started ringing. I can't remember whether it was vibrating or ringing out loud. I just noticed that the phone was receiving a call.

R. at 62.

Thus, there is no discussion in this testimony of the phone only merely

"illuminating." More importantly, when asked "what happened," Clutter stated that

the next thing that happened after he called "Liz" was that he noticed one of the

phones ringing or vibrating. The Court infers from this question and answer that

there was no intermediate step in between Clutter calling "Liz" and then perceiving

a phone to be ringing, such as Clutter first needing to physically pick up the phones

to look at their face-down sides. If such a step had been undertaken, then the

complete and truthful answer to "what happened" would have naturally included a

description of that process. The Court finds no reason not to credit Clutter's

testimony, which clearly suggests that he immediately perceived a phone to be

ringing after he dialed the numbers without the sort of physical manipulation that Defendant hypothecates.

Defendant also argues that the officers exceeded the scope of her consent by allowing more officers to enter the house to assist with the security sweep. But Defendant had consented to a security sweep, and there is no evidence that this consent was limited to a specific number of officers to conduct that sweep. And there is no evidence that these officers did anything other than help briefly sweep other areas of the house while Clutter and Spitzer were upstairs. Indeed, the officers testified that these additional agents exited after finishing the sweep and before any additional interview of Defendant continued. Tr. at 37-38. There is no evidence that these additional support agents interacted with Defendant or conducted any search or seized or identified any evidence. The Court cannot find that the involvement of these agents in the sweep violated Defendant's consent or gives grounds to suppress any of the evidence obtained.

Thus, in sum: (a) Agent Clutter was lawfully present in the bedroom pursuant to the consensual security sweep; (b) he saw the phone openly in plain view in that room; (c) his mere act of calling the suspect "Liz's" number and then observing through his ordinary senses that the phone on the bed was ringing did not transgress any Fourth Amendment protected rights; and (d) the incriminating nature of the phone was readily apparent once it rang in response to the call to

"Liz." Agent Clutter therefore committed no violations by seizing the phone and none of the evidence obtained as a result is subject to suppression.

## C. *Detention of Defendant*

Defendant also argues that her statements and any evidence obtained as a result of her statements should be suppressed for the independent reason that they were obtained during an illegal detention.

Evidence seized as a result of illegal detention of a Defendant is subject to suppression. *See United States v. Perkins*, 348 F.3d 965, 971 (11th Cir. 2003) (excluding any statements and evidence seized from defendant's unlawful detention during which officers had questioned defendants and called in a canine unit); *see also Florida v. Royer*, 460 U.S. 491, 501 (1983) ("[S]tatements given during a period of illegal detention are inadmissible even though voluntarily given if they are the product of the illegal detention and not the result of an independent act of free will."). An initially consensual encounter between a police officer and a citizen can be transformed into a seizure or detention within the meaning of the Fourth Amendment, "if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *United States v. Mendenhall*, 446 U.S. 544, 554 (1980).

Defendant does not appear to argue that she had been seized from the inception of the "knock-and-talk" encounter. Defendant's argument appears to be

limited to the period after when Spitzer instructed her against using her phone. As Defendant argues, "[a] reasonable person would not believe that she was free to leave when she was not even free to make a simple phone call." Pl. Br. [42] at 11. At a minimum, therefore, this argument would not implicate the suppression of any evidence obtained prior to Spitzer giving the instruction against using a phone, including Agent Clutter's discovery of "Liz's" phone during the security sweep.

It is at least arguable that Defendant was subject to an investigatory detention as of when Defendant was instructed against using her phone. Around this same time, Clutter had also told Defendant they believed she "knew a lot" about the suspected illegal drug activity in the house, Tr. at 20, and Defendant had seen multiple agents present within the house to conduct a security sweep, even though most of them exited immediately after the sweep.

To be sure, an instruction to a drug-trafficking suspect not to use a phone temporarily while the police are present in a less than fully secure environment is not generally unreasonable for purposes of officer safety and evidence preservation. After all, the officers could not be sure that Defendant was not contacting co-conspirators to alert them to flee, destroy evidence, or even to mount some attack. But it is at least arguable based on the combination of these facts that a reasonable person subjected to this direction could have believed that she was not entirely free to leave during the questioning. Thus, the Court assumes *arguendo*

that Defendant subjected to an investigative detention at least by this point in the encounter.

But such a brief, investigatory detention is permissible pursuant to the Fourth Amendment so long as the police have a reasonable, articulable suspicion that criminal activity is afoot. *See Terry v. Ohio*, 392 U.S. 1 (1968). The Court easily finds that the officers had reasonable suspicion to conduct an investigatory detention. The officers already knew, from DEA-Charlotte, that a suspected drug dealer named "Liz" was likely present at the house, because the geolocational data associated with Liz's phone showed the phone located in the house. Another judge had already found probable cause that this phone was being used by "Liz" for drug trafficking, based on the warrant that DEA-Charlotte had obtained to track the phone's location. When the officers first encountered Defendant at the doorway of the residence, she introduced herself as "Elizabeth." These facts easily satisfy the standard of reasonable suspicion from the outset of the knock-and-talk. Such reasonable suspicion only increased after the security sweep, during which the officers found a gun in the bedroom, as firearms are commonly associated with drug trafficking, and then when Clutter confirmed that the phone being tracked pursuant to DEA-Charlotte's warrant was located in Defendant's bedroom. The agents were plainly permitted to at least conduct a brief investigative detention of Defendant to inquire about these matters.

### D. *Defendant's Statements*

Defendant first argues that all of her statements are subject to suppression as they were fruits "obtained as a direct result of the illegal search." *United States v. Crosby*, 739 F.2d 1542, 1549 (11th Cir. 1984). Because the Court finds no "illegal search" for the reasons explained above, there is no Fourth Amendment taint that implicates suppression of the Defendant's statements.

Defendant otherwise conclusorily states, only in a footnote in her opening post-hearing brief that includes no facts or particularized legal arguments, that she is also still "maintain[ing] her arguments" that her statements are subject to suppression on the basis of Fifth Amendment violations under *Jackson v. Denno*, 378 U.S. 368 (1964) and *Miranda v. Arizona*, 384 U.S. 436 (1966).

Generally, arguments made solely in footnotes, and conclusory references to issues without any particularized factual or legal discussion, are not sufficient to present an issue to the Court. While the Government bears the burden of proof with regard to the voluntariness of statements or any *Miranda* waiver in response to a properly asserted challenge, the Defendant is the movant and thus is obliged to adequately present her motion in her opening papers.[4] The conclusory footnote in Defendant's opening brief does not do so.

---

[4] Indeed, because there was no warrant justifying any entry into the residence or search in this case, the Government also bears the burden of proof to justify the applicability of a Fourth Amendment exception to the warrant requirement. Yet the

Nevertheless, in the interests of caution and completeness, the Court will discuss the *Miranda* and *Jackson-Denno* voluntariness issues despite them not being properly briefed. For many of the same reasons discussed above as to the voluntariness of the Defendant's consent to allowing entry and to the security sweep, the Court also finds that she voluntarily made her statements to the police and voluntarily waived her *Miranda* rights.

In *Jackson v. Denno*, 378 U.S. 368 (1964), the Supreme Court held that when a defendant objects to the introduction of a statement to law enforcement as involuntary, due process requires the trial court to make an independent determination that the statement was voluntary before it may be heard by the jury. A two-part inquiry determines the admissibility of a self-incriminating statement. First, the court must consider whether the Government complied with the requirements of *Miranda*. Second, the court must consider whether the statement was voluntary. *United States v. Jones*, 32 F.3d 1512, 1516 (11th Cir.1994).

In *Miranda*, 384 U.S. at 436, the Supreme Court held that a suspect who is in custody must be advised of his right to remain silent and of his right to the assistance of counsel prior to any interrogation by law enforcement.  The

---

Defendant still was able to present particularized legal and factual argument in her opening brief, befitting her status as Movant in this matter. Choosing to address the *Miranda* and *Jackson-Denno* issues, by contrast, in a conclusory footnote is confusing to the Court.

Government has the burden to show the knowing and intelligent nature of a *Miranda* waiver. *Id.* at 475.  The Supreme Court instructs courts to look for two things:

> First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the totality of the circumstances surrounding the interrogation reveal[s] both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived.
>
> *Moran v. Burbine*, 475 U.S. 412, 421 (1986) (quotation marks and citation

omitted).

Determining whether a statement and/or waiver is voluntary depends on whether, under all of the surrounding circumstances, the statement was the product of the accused's "free and rational" choice. *United States v. Jones*, 32 F.3d 1512, 1516 (1994); *see Arizona v. Fulminate*, 499 U.S. 279, 285–88 (1991). The Eleventh Circuit has stated:

> Sufficiently coercive conduct normally involves subjecting the accused to an exhaustingly long interrogation, the application of physical force or the threat to do so, or the making of a promise that induces a confession. Isolated incidents of police deception, and discussions of realistic penalties for cooperative and non-cooperative defendants, are normally insufficient to preclude free choice.
>
> *Jones*, 32 F.3d at 1517 (quotation omitted).

Here, as the Court has already noted, the officers did not engage in coercive tactics, and did not make threats or improper promises. The record suggests that the officers requested, and Defendant granted permission for them to enter and conduct a sweep. The record further showed that Defendant withheld consent and permission when she did not wish to give it, such as when she initially insisted on the officers obtaining a warrant before allowing a search. Specifically with regard to her statements, further circumstances show that Defendant acted voluntarily. First, Defendant at all times was in the familiar surroundings of her own home. Second, she specifically combined her statements to the officers with a request to be a "source." This suggests that her decision to give information was part of a self-serving effort to obtain perceived benefits from the police. Third, when the officers confronted her with their suspicion that she knew a lot about the drug trafficking issues they were investigating, she indicated that she wanted to talk more, but that she wished to do so in a more private room (which request the officers granted). This suggests that Defendant felt capable of setting the terms by which she would provide information and also emphasizes the importance of her being on her own home turf. Fourth, the record does not suggest that this encounter was particularly lengthy or that the questioning that led to Defendant making statements or waiving any rights was particularly grueling. Fifth, at the point when Defendant was arrested, she was specifically advised of her *Miranda* rights orally

and by a written form and the unrefuted testimony was that she agreed to waive those rights.[5]

### E. *Dismissal of Counts*

The Indictment includes two Counts: conspiracy to possess controlled substances with intent to distribute (Count One), and possession of controlled substances with intent to distribute (Count Two). Each count alleges that Defendant possessed (or conspired to possess) three separate illegal substances, that is, methamphetamine, cocaine and heroin. Defendant thus argues that each count effectively charge multiple crimes and that they should therefore be dismissed as duplicitous.

A duplicitous indictment charges two or more separate and distinct crimes in a single count. *See, e.g., United States v. Schlei*, 122 F.3d 944 (11th Cir. 1997). Conversely, an indictment that does not charge two separate offenses in one count is not duplicitous. Furthermore, where a single penal statute articulates several alternative ways the statute may be violated, and each is subject to the same punishment (as opposed to an independent sentence), the indictment may charge

---

[5] Defendant does not argue that she was "in custody" for *Miranda* purposes and entitled to *Miranda* warnings any earlier in the encounter than when she was placed under arrest. In contrast to the voluntariness of a *Miranda* waiver, it is the Defendant's burden to show that they were entitled to *Miranda* warnings by virtue of being subjected to custodial interrogation. Defendant's failure to assert this issue, including in the conclusory footnote in the opening brief, clearly waives this point.

any or all acts that violate that one statute in a single count, and the government can satisfy its burden of proof by proving that the defendant committed any of the acts alleged in violation of the statute. *United States v. Burton*, 81 F.2d 1566 (11th Cir. 1989).

Although Counts One and Two each allege distribution of more than one type of controlled substances (or conspiracy to do so), this does not necessarily reflect multiple separate crimes, as opposed to multiple ways of committing the same crime. *See United States v. Jackson*, 812 F. App'x 885, 893 (11th Cir. 2020)). Indeed, while the type and amount of narcotics sold may be relevant to the applicable sentence, those facts are not themselves elements of the offense. Therefore, it remains that the act of possession detailed in Count Two and the conspiracy to possess in Count One are not duplicitous simply because Defendant possessed or conspired to possess multiple drugs as part of the same singular act or conspiracy.

To be sure, there could be risk of confusion as to whether the jury has reached unanimity as to the particular type(s) and amount(s) of drugs being sold in this act. This potential problem does not necessarily make any of the counts "duplicitous," however, and in any event can be addressed by means other than dismissal, such as through appropriate jury charges and a special verdict form. *See, e.g., United States v. Miller*, 891 F.3d 1220, (10 Cir. 2018) (not reaching question

of duplicity of a count that "charges a single transaction, albeit one involving multiple drugs, conducted at the same time and place," because "any possible error in the indictment was cured" by instructions that the jury must unanimously agree as to "which controlled substance or substances, if any, the government has proven beyond a reasonable doubt the defendant dispensed, distributed, or caused to be dispensed or distributed.") Defendant's Motion to Dismiss [23] should therefore be **DENIED**.

## CONCLUSION

For the reasons described above, the Court **RECOMMENDS** that Defendants' Motions to Suppress [21][22][26][27] and Motion to Dismiss [23] be **DENIED**.

**IT IS SO RECOMMENDED** this 8th day of June, 2022.

JUSTIN S. ANAND
UNITED STATES MAGISTRATE JUDGE