**FILED IN CHAMBERS**
**U.S.D.C ATLANTA**

Date: Jan 06 2023

**KEVIN P. WEIMER** , Clerk

By: /s/Sonya Lee Coggins

Deputy Clerk

### IN THE UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

UNITED STATES OF AMERICA,

v.

ELIZABETH MEJIA-VELAZQUEZ,
     Defendant.

Criminal Action No.
1:21-cr-00137-SDG

## OPINION AND ORDER

This matter is before the Court on Defendant Elizabeth Mejia-Velazquez's

Objections [ECF 57] to United States Magistrate Judge Justin S. Anand's Report &

Recommendation (the R&R) [ECF 53]. After careful consideration of the parties'

filings and the evidentiary record,[1] and with the benefit of oral argument,[2] Mejia-

Velazquez's Objections [ECF 57] are **SUSTAINED IN PART and OVERRULED**

**IN PART**. The R&R [ECF 53] is **ADOPTED IN PART and DECLINED IN PART**.

Mejia-Velazquez's motion to dismiss counts one and two as duplicitous [ECF 23]

is **DENIED**. Her amended motions to suppress evidence [ECF 26] and statements

---

[1]    In addition to her Objections and the R&R, the Court reviewed and considered Mejia-Velazquez's motions to suppress and dismiss [ECF 21; ECF 22; ECF 23; ECF 26; ECF 27], the corrected transcript of the November 1, 2021 evidentiary hearing on these motions before Judge Anand [ECF 39], Mejia-Velazquez's post-November 1 hearing brief [ECF 42], the Government's response brief [ECF 46], and Mejia-Velazquez's reply brief [ECF 51].

[2]    ECF 63.

[ECF 27] are **GRANTED** with regard to seizure of the cellphone and all evidence derived directly or indirectly therefrom. Her original motions to suppress evidence [ECF 21] and statements [ECF 22] are **DENIED as moot**.

## I.      Background[3]

Working on information they received from Drug Enforcement Administration (DEA) agents, officers from the Atlanta High Intensity Drug Trafficking Area (HIDTA) team obtained a warrant to track a cellphone believed to be in the possession of a suspected drug dealer known as "Liz."[4] On February 23, 2021, after tracking the phone pursuant to the warrant, as many as 10 officers traveled to Mejia-Velazquez's home in Buford, Georgia to conduct a "knock and talk."[5] Seven openly armed officers remained in the driveway area by the road, *i.e.*, the curtilage, so as not to "overwhelm[ ] [the occupants] with a bunch of

---

[3]   This Order repeats the facts from the R&R as necessary to analyze the Objections. The other facts in the R&R are incorporated by reference. *See Garvey v. Vaughn*, 993 F.2d 776, 779 n.9 (11th Cir. 1993) (noting that, to the extent there are no specific objections made to factual findings by a magistrate judge, there is no requirement that the district court review those findings *de novo*). Mejia-Velazquez objects to the R&R's exclusion of a few facts, and her objection is addressed below. *See infra* n.30.

[4]   ECF 53, at 1–2.

[5]   *Id.*

officers";[6] HIDTA Officer Howard Spitzer, DEA Special Agent Justin Clutter, and a third officer walked to the front door and knocked.[7] When Mejia-Velazquez answered the door, Officer Spitzer asked if the three officers could enter her home and to talk about an "important matter."[8] Mejia-Velazquez responded, "Absolutely."[9]

Mejia-Velazquez and the three officers walked to the kitchen, where Mejia-Velazquez introduced herself as "Elizabeth," consistent with the DEA tip that led the officers to procure the warrant to geolocate "Liz's" cellphone.[10] Officer Spitzer explained that the officers were investigating possible drug trafficking and asked if they could perform a "safety sweep" to confirm "that there was no one else in the house."[11] Mejia-Velazquez again said, "Absolutely."[12] The three officers and Mejia-Velazquez went upstairs and into the primary bedroom, while an

---

[6]   *Id.* at 2.

[7]   *Id.* The record is inconclusive as to whether these officers were openly armed or whether Mejia-Velazquez was aware of their presence in her home.

[8]   *Id.*

[9]   *Id.*

[10]   *Id.*

[11]   *Id.* at 3.

[12]   *Id.*

unspecified number of the other HIDTA officers entered the home from the curtilage in order to sweep the remaining rooms on the home's lower levels.[13]

While in the primary bedroom, Officer Spitzer and Special Agent Clutter located and temporarily took custody of a gun.[14] Meanwhile, Special Agent Clutter also observed two cellphones on a bed in the room.[15] After completing the "safety sweep" and determining that nobody was in the room and nothing else in the room threatened the officers' safety, two of the officers and Mejia-Velazquez exited and walked downstairs.[16] Special Agent Clutter did not; he lingered behind and dialed the number of the target cellphone for which the officers had obtained a warrant.[17] He then "noticed that [one of] the phone[s] was receiving a call."[18] Special Agent Clutter picked up the cellphone, proceeded downstairs, and finished sweeping the premises with other HIDTA officers.[19]

---

[13] *Id.*

[14] *Id.*

[15] *Id.*

[16] ECF 39, at 62:21–63:19.

[17] *Id.*

[18] *Id.* at 14:23–15:2, 63:5–63:12.

[19] *Id.* at 63:19–63:24.

While Special Agent Clutter finished the "safety sweep," Mejia-Velazquez and Officer Spitzer sat in the kitchen.[20] Mejia-Velazquez asked if she could call her wife or her attorney.[21] Officer Spitzer asked why she would need to call her attorney,[22] and he instructed her not to make any calls.[23] She acquiesced. He then asked if there was anything illegal in the house, and she replied, "Not that I know of."[24] She further indicated that she and her wife used marijuana and that her wife used cocaine, but that there was no marijuana in the house, and she did not know whether there was any cocaine.[25]

Special Agent Clutter then returned to the kitchen with the target cellphone in hand, and "confronted" Mejia-Velazquez with it.[26] Specifically, Special Agent Clutter asked Mejia-Velazquez if she knew to whom it belonged.[27] He said that he

---

[20]   ECF 53, at 4.

[21]   *Id.*

[22]   *Id.*

[23]   ECF 39, at 17:22–18:1.

[24]   ECF 53, at 4.

[25]   *Id.*

[26]   At the December 14 oral argument before this Court, the Government described this portion of the officers' encounter with Mejia-Velazquez as a "confrontation."

[27]   *Id.*

believed the cellphone belonged to Mejia-Velazquez and knew it was involved in drug trafficking transactions.[28] He then stepped out of the kitchen, and Officer Spitzer noticed that Mejia-Velazquez was "manipulating something on her phone or doing something on her phone."[29] Officer Spitzer instructed Mejia-Velazquez to "hang it up, and . . . make any calls after" the officers left.[30] Special Agent Clutter returned to the kitchen and suggested that Mejia-Velazquez "knew a lot" about the suspected drug activity the officers were investigating.[31] At that point, Mejia-Velazquez's demeanor noticeably shifted. She asked to move the conversation into the adjacent dining room, presumably for more privacy.[32] The officers agreed. Once in the dining room, the officers continued to question Mejia-Velazquez, and she answered their questions, supplied information about the suspected drug

---

[28]   ECF 39, at 19:9–19:14, 19:20–19:23.

[29]   *Id.* at 19:15–19:17, 20:8–20:13.

[30]   *Id.* at 20:8–20:13. Mejia-Velazquez objects to the R&R's recitation of the facts insofar as it omits that Officer Spitzer "prevented Ms. Mejia from using her phone not just once but twice." ECF 57, at 1. The objection is **SUSTAINED**, and the facts are amended herein to reflect Officer Spitzer's reaction to Mejia-Velazquez's second attempt to use her cellphone.

[31]   ECF 53, at 4.

[32]   *Id.*

trafficking activity (including information from the seized target cellphone), and stated that she wanted to work as a "source."[33]

After as many as 20 minutes of questioning, Officer Spitzer asked Mejia-Velazquez if she would consent to a search of her home.[34] Mejia-Velazquez inquired whether the officers had a warrant, and when Officer Spitzer indicated that they did not, she said that she would "prefer" that the officers did not conduct a search.[35] Special Agent Clutter then asked Mejia-Velazquez to accompany him back up to the bedroom to retrieve her identification, and she complied.[36] Once there, Special Agent Clutter asked whether there was anything "illegal" in the room.[37] Mejia-Velazquez retrieved a black duffel bag filled with cash and two bags containing significant quantities of methamphetamine and heroin.[38]

Sometime after that, the officers began discussing whether Mejia-Velazquez should be arrested, and Special Agent Clutter suggested to his colleagues that she

---

[33]  *Id.*

[34]  *Id.*

[35]  *Id.* at 4–5.

[36]  *Id.* at 5.

[37]  *Id.*

[38]  *Id.*

should be used as a source, not arrested.[39] He then turned to Mejia-Velazquez and asked her whether there were any additional drugs; she admitted that there was a bag of drugs in the trunk of a car in the garage.[40] She retrieved the bag, which contained heroin, methamphetamine, and cocaine.[41] She then agreed to a search of the home and executed a DEA consent form, acknowledging she had "not been threatened or forced in any way" and "consent[ed] to this search."[42] Officers executed the search and found a potential drug ledger and scales.[43] Mejia-Velazquez was subsequently arrested and given a *Miranda* instruction.[44] She then made further incriminating statements.[45]

Mejia-Velazquez has filed four motions to suppress evidence and statements emanating from the February 23, 2021 "knock and talk," as well as one motion to dismiss the case.[46] On November 11, 2021, Judge Anand held an

---

[39] *Id.*

[40] *Id.*

[41] *Id.*

[42] *Id.*

[43] *Id.*

[44] *Id.* at 6.

[45] *Id.*

[46] ECF 21; ECF 22; ECF 23; ECF 26; ECF 27. Her amended motions to suppress evidence [ECF 26] and statements [ECF 27] supersede her original motions to

evidentiary hearing regarding the pending motions to suppress and dismiss, and took each under advisement.[47] Based on the evidence elicited from Officer Spitzer and Special Agent Clutter during that hearing and the parties' post-November 1, 2021 hearing briefs, Judge Anand issued the R&R on June 8, 2022 recommending that the motions be denied.[48] On June 29, Mejia-Velazquez filed her Objections.[49] The Court held oral argument on December 14.[50]

## II.   Discussion

In accordance with 28 U.S.C. § 636(b)(1)(C) and Rule 59 of the Federal Rules of Criminal Procedure, the Court conducted a *de novo* review of those portions of the R&R to which Mejia-Velazquez objects and reviewed the remainder of the R&R for plain error. *United States v. Slay*, 714 F.2d 1093, 1095 (11th Cir. 1983). While she lodges several objections to the R&R, they fall into five broad categories: (1) the scope of the "knock & talk"; (2)  the "safety sweep"; (3) the seizure of the target cellphone and whether the cellphone was in "plain view"; (4) the lawfulness of

---

suppress evidence [ECF 21] and statements [ECF 22], so the original motions are **DENIED AS MOOT**.

[47]   ECF 31; *see also* ECF 39.

[48]   ECF 53.

[49]   ECF 57.

[50]   ECF 63.

Mejia-Velazquez's detention; and (5) whether her statements and other evidence should be suppressed as "fruit of the poisonous tree." The Objections are **SUSTAINED IN PART** and **OVERRULED IN PART** as follows.

### A.    The "Knock and Talk" Objections

Mejia-Velazquez objects to the R&R's finding that (1) the three officers engaged in a permissible "knock and talk," (2) the "knock and talk" was not a ruse to gain entry to the home to search it, and (3) the presence of additional officers within the curtilage of the home did not exceed the scope of a "knock and talk."[51] She further contends that any evidence obtained in conjunction with the "knock and talk" is the fruit of an unlawful search and must be suppressed. These objections are **OVERRULED**.

It is "presumptively unreasonable" to search a home or its curtilage without a warrant. *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006). However, the Fourth Amendment, which prohibits warrantless and unreasonable searches and seizures of these spaces, is "not implicated by entry upon private land to knock on a citizen's door for legitimate purposes unconnected with the search of the premises." *United States v. Taylor*, 458 F.3d 1201, 1204 (11th Cir. 2006) (citing

---

[51]    ECF 57, at 2.

*Coolidge v. New Hampshire*, 403 U.S. 443, 466 (1971); *United States v. Tobin*, 923 F.2d 1506, 1511 (11th Cir. 1991) (no warrant necessary for officers to approach a house to question the occupants)). This is known as the "knock and talk" exception to the Fourth Amendment's warrant requirement, and it allows law enforcement to dispense with procuring a warrant unless: (1) an officer's behavior "objectively reveals a purpose to conduct a search" or (2) when an officer exceeds the geographic limitation of the "front door or a minor departure from it." *United States v. Walker*, 799 F.3d 1361, 1363 (11th Cir. 2015) (cleaned up).

Mejia-Velazquez first insists that the officers' behavior objectively revealed a purpose to "engage in more intrusive activities such as the purported 'safety sweep' and Clutter's call to the target phone."[52] She argues, for example, that the presence of the additional officers—whether standard HIDTA practice as Officer Spitzer testified[53] or not—allows the Court to "reasonably infer" that the interaction with her "would be more than a consensual conversation."[54] "The mere fact that [many officers being present in the curtilage] is standard practice does not

---

52   *Id.* at 3.

53   ECF 39, at 10:9–10:20.

54   ECF 57, at 3.

prove that it is in compliance with the Fourth Amendment."[55] But neither does it prove that the officers exceeded the bounds of the "knock and talk" exception.[56] There is no bright-line number of officers that *per se* invalidates a "knock and talk."

Along the same lines, Mejia-Velazquez also claims that the officers "did not begin a discussion regarding drug trafficking" upon entry into the home, underscoring their alleged ulterior motive to perform a sham "safety sweep" with the goal of identifying incriminating evidence without obtaining a warrant.[57] On this point, Mejia-Velazquez mistakes the record, which shows that the officers were transparent about the purpose of their investigation from the outset of their encounter:

> Q.   . . . . [Y]ou asked if you could come in to speak with her about an important matter and she said absolutely?
>
> A.   Right. And she stepped out of the doorway and led me, [C]lutter, and Lopez-Martinez to the kitchen

---

[55] *Id.*

[56] Mejia-Velazquez's attempt to compare this case to *United States v. Maxi*, 886 F.3d 1318, 1326–27 (2018), falls flat. ECF 57, at 5–6. Here, unlike in *Maxi* where ten officers (with at least one *having drawn his firearm*) took tactical positions in the curtilage of the defendant's home and around its perimeter via a hole in the fence, there is no indication that the situation "invite[d] an armed battalion into [her] yard to launch a raid." *Id.* at 1327. The record here (up to this point, at least) reflects a casual investigatory conversation, which never saw the officers milling about the home's curtilage engage with Mejia-Velazquez at all.

[57] ECF 57, at 3.

> area, which is a short distance into the [home]. . . .
> maybe 12 feet inside the house. Wasn't like all the
> way into the other side of the house. Kind of in the
> middle.
>
> . . . .
>
> Q.    And what happens then?
>
> A.    I told -- well, I asked her what her name was. She
> said her name was Elizabeth. . . . So then it clicked
> to me that this is probably the one that we're
> looking for. I told her that we were there because
> -- we knew that somebody in that residence was
> involved in drug trafficking. . . . Told her that --
> why we were there. I asked her who all was in the
> house, and she gave me a brief accounting of who
> was in the house. As it turned out, there were three
> juveniles like kids and then there were two, either
> adults or older juveniles, 17, 18ish, that were in the
> house. I asked her that -- if it would be okay if we
> do a safety sweep to make sure that there was no
> one else in the house. And, again, she responded
> by saying the word absolutely.[58]

As the R&R explains, "[a] knock and talk is not invalid simply because, in the course of seeking to speak to the occupants of a residence in furtherance of an investigation, officers ask for and obtain consent to enter the residence."[59] *United States v. Washington*, 2020 WL 3885752 (N.D. Ga. Jan. 27, 2020), *report and recommendation adopted by* 2020 WL 1887903 (N.D. Ga. Apr. 15, 2020). At worst, the

---

[58]   ECF 39, at 12:20–13:13, 13:17–14:11.

[59]   ECF 53, at 7.

Court can only attribute to the officers the motive of discussing their drug trafficking investigation with Mejia-Velazquez inside her home, and there is nothing about that motive that runs afoul of the law. *Walker*, 799 F.3d at 1363.

Even though the officers' entry was a technical violation of the "knock and talk's" geographic limitation of the "front door or a minor departure from it," *id.*, Mejia-Velazquez invited the officers into her home and eventually consented to the "safety sweep." And "if consent is freely given," as here, then "it makes no difference that an officer may have approached the person with the hope or expectation of obtaining [her] consent." *Kentucky v. King*, 563 U.S. 452, 463 (2011); *accord Washington*, 2020 WL 1887903, at *2 (finding a "knock & talk" valid even if the officer hoped to gain entry into the defendant's residence).[60]

Mejia-Velazquez's objections fail to contend with the R&R's analysis on these points,[61] and merely reiterate the unavailing arguments she raised in her

---

[60] Mejia-Velazquez argues that *King* is inapposite because it does not deal with the "knock and talk" exception to the Fourth Amendment's warrant requirement. *Id.* at 4–5. It does, however, squarely address how consent obviates the need for an exception to the warrant requirement regardless of an officer's intention. To that end, it is both apposite and persuasive.

[61] *Id.* at 4 ("The magistrate [judge] asserts that a knock and talk is not invalid simply because officers obtain consent for a search in the course of speaking to the occupants during the investigation. Ms. Mejia does not disagree with this general principal.").

post-November 1, 2021 hearing brief. Mejia-Velazquez's objections to the lawfulness of the "knock and talk" are **OVERRULED**.

### B.    The "Safety Sweep" and "Plain View" Objections

Mejia-Velazquez next objects to Judge Anand's conclusion that she consented to the "safety sweep" of her home, which resulted in Special Agent Clutter's seizure of her cellphone.[62] She primarily argues that, under the totality of the circumstances, her will was overborne by the officers' presence, and that, as with the "knock and talk," the officers leveraged deceitful tactics to obtain her consent to search her home under the guise of a "safety sweep."[63] Alternatively, in the case that her consent was valid, Mejia-Velazquez argues that Special Agent Clutter exceeded the scope of her consent, and that her cellphone was not in "plain view" such that he could lawfully seize it.

### 1.    The "Safety Sweep" Was Not a Protective Sweep.

As the Government conceded during the December 14 oral argument before this Court, the officers' "safety sweep" was not a "protective sweep" as that term is defined at law, regardless of how the officers labeled the search. Incident to an arrest, officers are permitted "as a precautionary matter and without probable

---

[62]  *Id.* at 6–7.

[63]  *Id.* at 6–9.

cause or reasonable suspicion" to perform a limited "protective sweep" of areas "immediately adjoining the place of arrest from which an attack could be immediately launched." *Maryland v. Buie*, 494 U.S. 325, 334 (1990). The record here makes abundantly clear that the officers had not formed the intention to arrest Mejia-Velazquez at the time that they conducted the "safety sweep." Had the officers intended to arrest her before entering her home under the auspices of a "knock and talk," they would have exceeded the scope of that "knock and talk" and invalidated the consent that paved the way for their entry. For this reason alone, the "safety sweep" was not a "protective sweep," which must be conducted incident to arrest. *Id.*

Further, a "protective sweep" lasts "***no longer than is necessary*** to dispel the reasonable suspicion of danger," and therefore would have terminated at the point that the officers concluded their search and determined there was no threat. *Id.* at 335–36 (emphasis added); *see also United States v. Cordova*, 758 F. Supp. 2d 1367, 1379 (N.D. Ga. 2010) ("The *Buie* line of cases is premised on the idea that a sweep is reasonable when presence in an unfamiliar setting is authorized and, once there, a danger reasonably is perceived that allows law enforcement personnel to sweep the home to protect against someone that may present a danger to them."). In other words, even if a protective sweep were permissible, by the time Special Agent

Clutter placed the call to the target cellphone, his presence in Mejia-Velazquez's bedroom would not have been justified, his call to the target cellphone would have exceeded the scope of a valid protective sweep, and anything he seized would have been obtained illegally. Accordingly, the "safety sweep"—regardless of the label the officers gave it—could only have been valid if Mejia-Velazquez consented to it.

> **2.    The "Safety Sweep" Exceeded the Scope of Mejia-Velazquez's Consent.**

Treating the "safety sweep" as a consent search, Mejia-Velazquez objects to the R&R's proposed finding that her consent was valid.[64] That objection is **OVERRULED**. However, her objection that the officers exceeded the scope of her consent is **SUSTAINED**.

Among the relevant facts considered when a court assesses whether consent was freely and voluntarily given are the custodial status of the person giving consent, the presence of coercive police procedure, the extent and level of cooperation with the police, the person's awareness of her right to refuse consent to entry or search of the premises, and the education, intelligence, and subjective state of the person who consents. *Tukes v. Dugger*, 911 F.2d 508, 517 (11th Cir. 1990)

---

[64]   ECF 57, at 9–10.

(citations omitted). As with the "knock and talk," the only evidence here weighing against consent was the presence of the additional armed officers ambling in Mejia-Velazquez's curtilage, and the record is silent as to whether Mejia-Velazquez was aware of them, let alone influenced by their presence, when the officers requested permission to perform the "safety sweep." Indeed, the record suggests that the officers in her curtilage stayed put (except to assist with the "safety sweep" in a limited capacity) in an effort not to "overwhelm" her,[65] and nothing in the record supports the conclusion that her will was overborne by their presence when she consented to the "safety sweep."

Further, to the extent the additional officers' presence weighs against the validity of Mejia-Velazquez's consent to the "safety sweep," it is only one fact. Several facts weigh in favor of valid consent. To that point in the encounter, Mejia-Velazquez appeared willing to cooperate with the police despite her knowledge that they suspected someone in the home of trafficking drugs. As discussed above, there was no ruse or misrepresentation about the nature of the investigation, and she seems to have understood that the officers could not perform certain tasks without a warrant, as evidenced by her later indication that she "prefer[red]" that

---

[65]   ECF 53, at 2.

the officers obtain a warrant to search her home for drug contraband.[66] Most persuasively, when the officers inquired about whether they could perform a "protective sweep" of her home, Mejia-Velazquez responded, "Absolutely."[67]

This is not a case in which officers exploited a citizen's desire to assist them in their official duties for the express purpose of incriminating her, as Mejia-Velazquez suggests; the beginning of this encounter is textbook investigatory procedure *and* black letter consent to conduct a limited search of her home, regardless of the officers' alleged hopes that they would find evidence of wrongdoing.[68] *King*, 563 U.S. at 464 (noting that an officer's subjective motive for a search does not "invalidate[ ] objectively justifiable behavior under the Fourth Amendment") (citations omitted).

Because Mejia-Velazquez's consent to the "safety sweep" was valid, the only issue is whether the officers exceeded its scope. The law on this point is straightforward: "The scope of a consensual search is determined by the terms of the actual consent." *United States v. Martinez*, 949 F.2d 1117, 1119 (11th Cir. 1992)

---

[66]  *Id.* at 4–5.

[67]  ECF 53, at 10–11.

[68]  ECF 57, at 8–9. For this reason, the cases Mejia-Velazquez cites, which deal with ruse and deception, are factually inapposite.

(citations omitted). "When an individual gives a general statement of consent without express limitations," as Mejia-Velazquez did in this case, "the scope of a permissible search is not limitless." *Id.* (quoting *United States v. Harris*, 928 F.2d 1113, 1117 (11th Cir. 1991)). It is instead constrained by the bounds of reasonableness—*i.e.*, "what a police officer could reasonably interpret the consent to encompass." *Id.* To determine the bounds of reasonableness in such a case, the Court "must consider what the parties knew at the time to be the object of the search." *Id.* (citing *Florida v. Jimeno*, 500 U.S. 248, 251 (1991); *Harris*, 928 F.2d at 1118)); *cf. United States v. Strickland*, 902 F.2d 937, 941–42 (11th Cir. 1990) (finding that the defendant's permission to search an automobile for contraband could not reasonably be construed to include permission to slash the automobile's spare tire). "[A]ny evidence gathered beyond those boundaries must be excluded." *Martinez*, 949 F.2d at 1119.

Though Mejia-Velazquez's indication of consent to the officers' request to perform the "safety sweep" was an unqualified "absolutely," the bounds of that consent are easy to discern from this record. Officer Spitzer explained what he told Mejia-Velazquez he intended to accomplish in performing the safety sweep: "I asked her that -- if it would be okay if we do a safety sweep to make sure that there was no one else in the house. And, again, she responded by saying the word

absolutely."[69] Thus, at the time of the search, Mejia-Velazquez and the officers understood that the "safety sweep" would encompass a search for people in her house, including her bedroom; the goal of the "safety sweep" was apparent from the label Officer Spitzer gave it. The officers, including Special Agent Clutter, could only reasonably interpret the scope of Mejia-Velazquez's consent to be a search for people who could pose a risk to the officers' safety during their encounter with her. As Mejia-Velazquez argues, "[h]er consent was explicitly limited by the parameters of the officer's own request,"[70] and the Government conceded as much during the December 14 oral argument.

On cross-examination at the evidentiary hearing before Judge Anand, Agent Clutter illustrated exactly how he exceeded the bounds of Mejia-Velazquez's consent:

> Q.   I want to go back to earlier when you were involved in the safety sweep. You said at one point that you were in the room with Ms. Mejia and Officer Spitzer, and then they both left out of the bedroom and went downstairs?
>
> A.   Yes, started to go like down the stairs at that point.
>
> Q.   And so you stayed in the bedroom at that time.
>
> A.   I was still in bedroom when they walked out.

---

[69]   ECF 39, at 14:8–14:11.

[70]   ECF 57, at 10.

> Q.     And there was no one else in the room at that time?
>
> A.     No.
>
> Q.     And that's when you called the cell phone?
>
> A.     Yes.[71]

From Special Agent Clutter's own account, he exceeded the scope of Mejia-Velazquez's consent as soon as he discerned there was nothing else in the room—person or object—that posed a threat to the officers' safety. By the time Special Agent Clutter called the target cellphone and seized it, he had already confirmed that nobody else was in the bedroom and that nothing in the bedroom posed a danger to the officers. Accordingly, the sweep of the bedroom was over and Special Agent Clutter was no longer in the bedroom by consent.[72] In this regard, Mejia-Velazquez's objections to the R&R's findings regarding whether the officers exceeded the scope of her consent to the "safety sweep" are **SUSTAINED**.

### 3.     The "Plain View" Doctrine Does Not Apply to the Seizure of the Target Cellphone.

Mejia-Velazquez objects[73] to the R&R's conclusion that the "plain view" doctrine allows for the seizure of the target cellphone.[74] "The plain view doctrine

---

[71]   ECF 39, at 73:18–74:3.

[72]   ECF 57, at 10.

[73]   ECF 57, at 11.

[74]   ECF 53, at 12.

permits a warrantless seizure where (1) an officer is lawfully located in the place from which the seized object can be plainly viewed and [has] a lawful right of access to the object itself; and (2) the incriminating character of the item is immediately apparent." *United States v. Smith*, 459 F.3d 1276, 1290 (11th Cir. 2006) (cleaned up).

> **i.** **Special Agent Clutter Was Not Lawfully Located in the Primary Bedroom When He Seized the Target Cellphone.**

As discussed above, Special Agent Clutter was not lawfully located in Mejia-Velazquez's bedroom when he seized the target cellphone. *See Horton v. California*, 496 U.S. 128, 136 (1990) ("It is, of course, an essential predicate to any valid warrantless seizure of incriminating evidence that the officer did not violate the Fourth Amendment in arriving at the place from which the evidence could be plainly viewed."). From the record, it appears that Special Agent Clutter observed the two cellphones on Mejia-Velazquez's bed sometime before he and the other officers determined that the bedroom was secure and exited with Mejia-Velazquez. Had Special Agent Clutter recognized the target cellphone as incriminatory at that point, he could have lawfully seized it. As the Government conceded during the December 14 oral argument, however, Special Agent Clutter only discerned that one of the cellphones was incriminating after he had

determined that the room was secure—that is, after he was no longer authorized to be there.

Though the record is unclear as to exactly how long Special Agent Clutter lingered in the bedroom to call the target cellphone, the Court acknowledges that it might only have been a short time. Perhaps with this logic in mind, the Government urged the Court at oral argument not to take a "hypertechnical" approach to the plain view analysis. But the Fourth Amendment demands a highly fact-specific analysis; it is not a mere technicality to engage in it. *See, e.g.*, *United States v. Bruce*, 977 F.3d 1112, 1121 (11th Cir. 2020) (Whether property is within curtilage turns on "fact-intensive inquiries."); *Hart v. Logan*, 664 F. App'x 857, 862 (11th Cir. 2016) (citation omitted) ("Analyzing excessive force under the Fourth Amendment is a fact-intensive inquiry . . . ."); *United States v. Segura-Baltazar*, 448 F.3d 1281, 1287 (11th Cir. 2006) ("Whether trash is sufficiently exposed to the public to render any expectation of privacy objectively unreasonable is a fact-intensive inquiry.").

By the time Special Agent Clutter discovered that one of the two cellphones on Mejia-Velazquez's bed was the target cellphone, he had already exceeded the scope of Mejia-Velazquez's consent to perform the "safety sweep" of the bedroom and had run afoul of the Fourth Amendment. Thus, he was not permitted to seize

it under the plain view doctrine. *Smith*, 459 F.3d at 1290 (citation omitted) (emphasis added) ("The plain view doctrine allows police officers to seize any contraband in plain view *if the officers have a right of access to the place where the contraband is located*.").

> ### ii.   The Incriminating Nature of the Target Cellphone Was Not Immediately Apparent.

It is generally true, as the R&R explains, that Special Agent Clutter did not need Mejia-Velazquez's express consent to call a phone number he already associated with a cellphone for which the officers had a geolocation warrant.[75] The Court discerns no legitimate subjective or objective expectation of privacy in the observation of a dialed cellphone—which might light up, vibrate, or ring—sitting on a bed in a room officers *lawfully* occupied. But, as discussed above, Special Agent Clutter was not lawfully present in Mejia-Velazquez's bedroom when he called the target cellphone and observed it respond to the call. And had the officers begun calling the target cellphone as soon as they entered Mejia-Velazquez's home, the "knock and talk" would surely have been a ruse, and the validity of Mejia-Velazquez's consent at different stages of the encounter would be called into question.

---

75   *Id.* at 16 n.3.

It is also true, as the R&R sets out, that calling the target cellphone here required no physical manipulation of it as compared to the notorious lifting of a turntable that the Supreme Court considered in *Arizona v. Hicks*, 480 U.S. 321, 323–25 (1987) (finding that an officer's actions in physically manipulating stereo equipment to locate a serial number constituted a Fourth amendment search, which had to be supported by probable cause and was not excusable under the plain view doctrine). But there are at least two problems with the Government's reliance on *Hicks*.

First, that 1980s-era decision did not contend with the contemporary problems cellphones pose. There are a number of ways to "reach out" to cellphones, in contrast to a 1980s turntable, which cannot be geolocated or dialed, cannot connect to the internet, and differs from the now-ubiquitous cellphone in countless ways. *See Riley v. California*, 573 U.S. 373, 393 (2014) ("Cell phones differ in both a quantitative and a qualitative sense from other objects that might be kept on an arrestee's person. The term "cell phone" is itself misleading shorthand; many of these devices are in fact minicomputers that also happen to have the capacity to be used as a telephone. They could just as easily be called cameras, video players, rolodexes, calendars, tape recorders, libraries, diaries, albums, televisions, maps, or newspapers.").

Second, and more importantly, any rigid focus on the physical manipulation of the turntable in *Hicks* is misguided and discounts the Supreme Court's holding: "Taking action [absent probable cause], unrelated to the objectives of the authorized intrusion, which exposed to view concealed portions of the apartment or its contents, did produce a new invasion of respondent's privacy unjustified by the exigent circumstance that validated the entry." *Hicks*, 480 U.S. at 325–26. Physical manipulation of suspected contraband is merely one such action that tracks the facts presented in *Hicks*, but it is not the only action that is capable of producing an invasion of a defendant's privacy, any and all of which must be supported by probable cause. And, as the Government conceded at oral argument, the officers had no probable cause to seize either cellphone until Special Agent Clutter took an additional action (*i.e.*, calling the cellphone) unrelated to the objectives of the authorized safety sweep (*i.e.*, to look for persons or objects that might pose a risk to the officers' safety).

The Court acknowledges that other courts in this District have applied the "plain view" doctrine and declined to suppress seized cellphones under similar facts. In *United States v. Rodriguez-Alejandro*, for example, DEA agents were lawfully present in the defendant's bedroom as part of a drug trafficking investigation, and they observed four cellphones. 664 F. Supp. 2d 1320, 1345

(N.D. Ga. 2009). The DEA agents neither physically manipulated the phones nor attempted to call them; they merely "immediately recognized the incriminating nature of the cell phones." *Id.* Even though there were two individuals in the defendant's bedroom and the defendant maintained that the DEA agents could not have known which cell phones belonged to which individual without further examination of them, Judge Thrash determined that the cellphones were lawfully seized pursuant to the "plain view" doctrine. *Id.* at 1345–46.

In the context of that drug trafficking wiretap investigation, Judge Thrash reasoned that the DEA agents had probable cause to seize the cellphones regardless as to whom they belonged: "Although the agents could not immediately ascertain whether all four cell phones belonged to [the defendant], the phrase 'immediately apparent' does not imply that an unduly high degree of certainty as to the incriminatory character of evidence is necessary for an application of the 'plain view' doctrine." *Id.* at 1345 (cleaned up) (quoting *Texas v. Brown*, 460 U.S. 730, 741 (1983)). In other words, Judge Thrash concluded that cellphones, which are often instrumentalities of the drug trade, were inherently incriminatory and justifiably seized in that specific context. *Id.* at 1345 (citing *United States v. Santillan*, 571 F. Supp. 2d 1093, 1100–01 (D. Ariz. 2008) (finding the seizure of a cellphone justified under the "plain view" doctrine where "officers

had good reason to believe the phone was being used in the furtherance of a drug-trafficking crime" and citing authority for the proposition that cellphones "in drug-trafficking investigations may come within the plain view exception to the warrant requirement as items akin to contraband, in that they are often tools of the drug-trafficking trade.")).

Notwithstanding the *Rodriguez-Alejandro* decision, the Government conceded during oral argument that cellphones are not inherently incriminatory. Undersigned agrees, and respectfully declines to adopt Judge Thrash's reasoning, especially in light of the modern-day proliferation of cellphones and their special character. *Cf. United States v. Lall*, 607 F.3d 1277, 1291–92 (11th Cir. 2010) (computer equipment was not seized in "plain view" when officer did not know from merely looking at it that it was an instrumentality of credit card fraud).

Instead, the Court is persuaded by more recent opinions issued by other courts in this Circuit under similar circumstances. *See, e.g.*, *United States v. Fortson*, 2019 WL 9831021, at *10 (M.D. Ala. July 31, 2019) ("The undersigned finds that, unlike crystallized substances on the floor and in the toilet or green, leafy substances on the bed, it is not "immediately apparent" that a cell phone is incriminating."), *report and recommendation adopted*, 2020 WL 2404891 (M.D. Ala. May 12, 2020), *aff'd*, 2022 WL 1214151 (11th Cir. Apr. 25, 2022); *United States v.*

*Jackson*, 155 F. Supp. 3d 1320, 1333 (S.D. Fla. April 16, 2014) (suppressing cell phones found as part of a protective sweep where there was no evidence or testimony pointing to the incriminating nature of the cell phones, "[r]egardless of the amount or from where the cellphones were collected").

For these reasons, the cellphone and all evidence emanating from its discovery must be suppressed.[76] The R&R is **OVERRULED IN PART** and Mejia-Velazquez's amended motions to suppress are **GRANTED** on this basis. Mejia-Velazquez's additional objection to the R&R's finding that her consent to the "safety sweep" was limited to the three officers who initially entered her home, not the additional officers who entered from the curtilage to momentarily assist them, is moot and **OVERRULED**.[77]

## C.    The Detention Objections

Mejia-Velazquez further objects to the R&R's finding that she was lawfully detained during her encounter with the officers.[78] Specifically, Mejia-Velazquez

---

[76]   ECF 26, at 3 n.1 (moving the Court to suppress the contents of the target cellphone). The evidence that must be suppressed is discussed in greater detail below. *See infra* Section II.D. (discussing suppression of the evidence beyond the target cellphone and its contents).

[77]   ECF 57, at 14. Moreover, there is no allegation that these additional officers uncovered any incriminating evidence during the "safety sweep," so the objection appears legally immaterial.

[78]   *Id.* at 15.

argues that she was seized at the point that Officer Spitzer instructed her against using her cellphone.[79] It is unclear to undersigned whether there is any material evidence at issue here that has not already been independently suppressed because of the unlawful seizure of the cellphone. For this reason, Mejia-Velazquez's objection to the R&R's finding concerning her detention is **OVERRULED as moot**. The R&R is **ADOPTED IN PART** and Mejia-Velazquez's amended motions to suppress are **DENIED IN PART as moot** on this basis. However, Mejia-Velazquez is granted leave to renew her objection through a motion in limine if necessary, providing particulars to the Court as to what specific evidence she seeks to exclude based on her detention.

### D.   The Incriminating Statements Objections and "Fruit" of the Unlawfully Seized Cellphone

Mejia-Velazquez objects to the R&R's recommendation that her statements should not be suppressed.[80] This objection is **SUSTAINED**. Because of the unlawful seizure of the cellphone, her subsequent statements to law enforcement after being confronted with the cellphone must likewise be suppressed as fruit of the poisonous tree. *See Wong Sun v. United States*, 371 U.S. 471, 487–88 (1963); *Brown*

---

[79]   *Id.* at 16.

[80]   ECF 57, at 17–19.

*v. Illinois*, 422 U.S. 590, 601 (1975); *United States v. Crosby*, 739 F.2d 1542, 1549 (11th Cir. 1984).

"The exclusionary rule, which bars the admission of evidence obtained in violation of the Constitution, extends beyond the direct products of police misconduct to evidence derived from the illegal conduct, or 'fruit of the poisonous tree.'" *United States v. Terzado-Madruga*, 897 F.2d 1099, 1113 (11th Cir. 1990) (citation omitted). The test to determine whether evidence is "fruit of the poisonous tree" is straightforward: Was the causal connection between the unlawfully seized direct evidence and the later seized indirect evidence unavoidable? *United States v. Sanchez*, 334 F. Supp. 3d 1284, 1298 (N.D. Ga. 2018) (citation omitted). If such a causal connection is established, then the physical or statement evidence might nevertheless be admissible upon evidence of certain factors that show the taint of the illegal conduct has been purged. *Brown*, 422 U.S. at 603–04. These factors include the temporal proximity between the illegal conduct and obtaining subsequent inculpatory evidence, the purpose and flagrancy of the official misconduct, and the presence of intervening circumstances that break the chain between the illegal conduct and the inculpatory evidence. *Id.* And, in the case of statement evidence, the Government must additionally show that the statements were voluntarily made. *Id.* at 601–02 (noting that *Wong Sun*

requires not merely that a statement meets the Fifth Amendment voluntariness standard but that it be "sufficiently an act of free will to purge the primary taint" in light of the distinct policies and interests of the Fourth Amendment).

Here, the causal connection between the illegal conduct and the resulting physical and statement evidence is evident. Setting aside the voluntariness of Mejia-Velazquez's statements or purported consents, the Government has also failed to show that, on balance, the factors in this case sever that connection or otherwise purge the taint of the illegal search and seizure of the cellphone such that any physical or statement evidence obtained thereafter "was not the product of the illegal [conduct]." *United States v. Waksal*, 709 F.2d 653, 662 (11th Cir. 1983) (quoting *United States v. Berry*, 670 F.2d 583 (5th Cir. 1982) (en banc)).

First, the temporal proximity between the officers' illegal conduct and their procurement of any additional evidence or statements is insignificant. It is not clear how long the encounter between Mejia-Velazquez and the officers lasted. But there is no indication of any significant break in time between the seizure of the cellphone and the procurement of any additional evidence, much less the **hours** of time considered insufficient to purge the taint of similarly illegal conduct in other cases. *See, e.g., Brown*, 422 U.S. at 604–05 (finding that Illinois failed to sustain its burden of showing the admissibility of in-custody statements taken after an illegal

arrest, which—both in design and purpose—was investigatory and the first statement was separated from the illegal arrest by less than two hours).

Second, the Government has not met its burden to show that some intervening event purged the taint of the illegal conduct such that the officers would have arrived at the same incriminating evidence and statements in the absence of that conduct, including (but not limited to) the later discovered scales and ledger, as well as any incriminating statements made after Mejia-Velazquez's arrest. *United States v. Bailey*, 691 F.2d 1009, 1013 (11th Cir. 1982) (cleaned up) ("The relevant inquiry examines the extent of the causal connection between the lawless police conduct and the evidence in question; *i.e.*, whether, granting the establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint."); *cf. United States v. Delancy*, 502 F.3d 1297, 1308–14 (11th Cir. 2007) (discussing the temporal proximity and potential intervening circumstances between a protective sweep and a defendant's subsequent consent to a search); *United States v. Roberts*, 888 F. Supp. 2d 1316, 1324 (N.D. Ga. 2012) (finding no ill-motive or flagrancy of police conduct but nevertheless concluding that the Government did not show any "genuine break in the chain of events or intervening circumstances" to purge the taint of the

illegal conduct, and suppressing all evidence emanating from the illegal entry, search, and questioning of the defendant).

While the Government argues that it was the officers' "confrontation" with Mejia-Velazquez regarding accusations of drug trafficking, not the seized cellphone, that motivated her choice to supply incriminating evidence and statements and consent to additional searches, this argument strains credulity. This "confrontation" cannot be divorced from the cellphone that the officers brandished as they coaxed Mejia-Velazquez to talk and cooperate. Indeed, there is no indication that the "confrontation" would have occurred without the seizure of the cellphone in the first place.

Finally, the Government encouraged the Court during oral argument to consider the "substantial societal costs" of suppression in this case and to find that "none of the benefits of suppression" are served here. However, the benefits of safeguarding constitutional rights are manifest: "Although this result may be unsettling because of society's strong interest in stemming the flow of illegal drugs, we must recognize that the constitutional protections of the Fourth Amendment are to shield the innocent, even though the one who claims and benefits by them in this particular case indisputably sought to violate the law." *Waksal*, 709 F.2d at 663 (finding that the Government failed to meet its burden of

proving that the defendant's consent was freely and voluntarily given or that any "significant intervening event purged the taint of the illegal restraint on [the defendant's] liberty," and reversing the district court's admission of tainted drug evidence and statements).

The R&R is **OVERRULED IN PART,** and Mejia-Velazquez's amended motions to suppress evidence and statements are **GRANTED IN PART**. The seizure of the cellphone, as well as all evidence derived directly or indirectly therefrom, is suppressed. To the extent the parties disagree as to whether a particular piece of evidence constitutes fruit from the unlawful phone seizure, either party may file a motion in limine seeking clarification.

## III.   Conclusion

Mejia-Velazquez's Objections [ECF 57] are **SUSTAINED IN PART and OVERRULED IN PART**. The R&R [ECF 53] is **ADOPTED IN PART and OVERRULED IN PART** as set out in this Order. The Court adopts all other portions of the R&R to which Mejia-Velazquez did not object, including the R&R's additional recommendation that her indictment was not duplicitous.[81] *Schultz*, 565 F.3d at 1360. Mejia-Velazquez's motion to dismiss counts one and two as

---

[81]   ECF 53, at 26–28.

duplicitous [ECF 23] is **DENIED**. Her amended motions to suppress evidence [ECF 26] and statements [ECF 27] are **GRANTED**. Her original motions to suppress evidence [ECF 21] and statements [ECF 22] are **DENIED as moot**.

      **SO ORDERED** this 6th day of January, 2023.

Steven D. Grimberg
United States District Court Judge